Okay, our next case for argument is Carol Bolt v. United States. Good morning. My name is Robert Sparks. I'm the attorney representing appellate Carol Bolt in this case. Ms. Bolt's appeal arises from her filing of a U.S. District Court complaint during December of 2002 that was concerned her fall at Fort Wainwright Military Army Base on April 1 of 1999 when the Army hadn't plowed any snow out of her parking lot for the entire winter. She came out. It had been warm. There had been some warm days, some cold days. She came out to throw her bag of trash in the dumpster. She slipped, fell down, broke her ankle, wound up having a compound, wound up having an open reduction surgery on that. After discovery, the U.S. moved for a summary judgment, and they said that there wasn't any causation, that the claim was barred by discretionary immunity. In the order entered by Judge Weisslein on the United States motion for summary judgment, Judge Weisslein denied the summary judgment motion that addressed the discretionary immunity. He found that the snow removal plan that was for 1998-99 was a mandatory regulation that the Army was required to remove the snow. The Department of Public Works at Fort Wainwright was required to remove the snow from Ms. Bolt's parking lot by the end of March, but because it hadn't removed the snow, they could not rely on discretionary immunity. However, Judge Weisslein did grant the motion for summary judgment. What he explained was that he granted it on the basis of municipal immunity, relying on Hale v. City of Anchorage. Basically, he said, well, they have all this area and I don't think they should be responsible for safety of the tenant in the parking lot in the common area. He also found that because Ms. Bolt, as an occupant of the housing, had her husband had signed a document as a condition of housing, an agreement that said that they helped remove the snow, that Ms. Bolt somehow was responsible for all of her own injuries. Ms. Bolt filed a timely Rule 59 motion. So what's wrong with the judge's ruling right there? He didn't rely on Alaska law. Alaska law... He looked at what a private entity might do under Alaska law, the obligations of a private person, purposes of assessing what the government's obligation is, correct? Basically, under Alaska law, you have the Coburn v. Burton case and you have the Uniform Landlord-Tenant Act, which requires that the government provide a safe common area. They have a continuing duty to make the common area safe. He looked at what a municipality might do, rather than what the obligation of a private person. Correct. And under the law, it should be a private person, correct? It should be a private person. Why doesn't the discretionary function exception apply here to the FTCA? Because under the discretionary function exception, what you look at is a two-step process from the decision U.S. v. Galbert. The first step is we look and see if they have a mandatory policy. In this case, our position is they have a mandatory policy. They have a snow removal policy that says they're going to have the snow out of there in March. It wasn't out of there in March. It seems to contemplate some exceptions. The snow removal policy does not have any exception for removal of the snow by March. It states that if there's a... that they're going to do it as time permits, that they're going to post the lots. There's another provision of snow removal policies that discusses if people don't move their cars, that they can reschedule that particular lot. But there's no provision in the snow removal policy that says, well, if people leave their cars in the lot, you never have to remove the snow. And the problem here is, is that the snow removal policy itself, even if you don't find the snow removal policy is a mandatory policy, they got this resident handbook. And the resident handbook says the senior occupant, who's Sergeant Kahn, is supposed to coordinate these people to remove the snow from the common areas. And our position is Sergeant Kahn. He didn't do his duty. Sergeant Kahn, he's supposed to, as a senior occupant, he's got these duties under the resident handbook that are additional work duties. He's supposed to report this condition. If he finds a hazardous condition, he's required under the resident handbook to report it. He didn't do that either. Then, even if you find that there isn't a mandatory policy, if there's some reason you So, look, the second step is, this two-step process, is to determine if the discretion that was exercised is protected. And, you know, what they said, you know, is, hey, we want to look at, you know, the Supreme Court in the Varied Airlines case. They said, we want to look at, you know, are they weighing economic, social, and political policy here? And under the line of authority interpreting the Varied case in the Ninth Circuit, failure to maintain real property in a safe condition because of budgetary concerns is not something that's ever been accepted as being something that's protected by discretionary function immunity. You know, you look at the Summers case, which involved the maintenance of the beach property with the fire rangers. You look at the Irrigation Canal case, which is O'Toole. You look at the Snow Machine Trail case, Obertson. You look at the roadway cases, which are A-R-R, A-A, A-R-A, and the Subler case. In all of those cases, basically what the Ninth Circuit said is, is when we're talking about the federal government in a position of a private landowner and maintaining their property, saying that we got a budgetary, we budgeted our money to spend that money someplace else is not protected under discretionary function immunity. And if you look at Ms. Bolt's lawsuit, it involves a mundane question of routine parking lot maintenance that's very similar to these other failure to maintain cases. In Ms. Bolt's case, the federal government undertook this responsibility to be her landlord and to provide a safe premises, a safe housing for these people that are military spouses, children, members of the military. And under the circumstances of this case, it's very clear that the Army was negligent because what they did was, is they didn't keep the common areas safe. The delegation, what they may be able in the federal law, they can make these military people and their families maybe do this work. But if you look at the exact contract that was entered into, the person that has that responsibility is the military sponsor, which is the military member. This is given to, these additional duties as far as the snow removal and the common areas are given to these military people as additional work duties for the benefit of their employer. Under Alaska law, that creates at least a question of fact as to whether vicarious responsibility applies. The government relies on this convoluted reasoning, I think, under the Hale v. Municipality of Anchorage case, which is what, you know, we filed this Rule 59 motion, and Judge Beisling, you know, we pointed out, hey, you know, this is a private person. Would a private person be responsible under state law? And we pointed out this issue about the vicarious responsibility, and Judge Beisling came back on the Rule 59 motion and said, denied for the reasons stated in the United States' opposition. And he added another little quote that indicated that he thought factually the government shouldn't be held responsible in this kind of situation. He analogized the government as more like a municipal employer under Alaska law rather than a private person. Well, that's what he said in his first decision on the summary judgment, but then in the second one, in the ruling on the Rule 59 motion, the quote he had was more like, it's not the nature of the duty, but the scope or, you know, what the magnitude is that they have all this property to take care of. But if you look at the Alaska Supreme Court cases, what the Alaska Supreme Court cases say is, you know, under Kramer v. Carr's Food Center, the Alaska Supreme Court specifically addressed this kind of situation. And, you know, it's amazing, the Kramer v. Carr's Food Center case, very similar to what happened in Ms. Bolt's case. They didn't remove any of the snow. They didn't take any action to spread sand or any traction material. The Supreme Court in that case said, even if people know that that parking lot isn't safe, that's not a defense. In the present case, we believe that Ms. Bolt has shown adequate evidence of negligence and there is no basis for application of discretionary immunity in this case. And we'd ask that cases be resolved. You agree, do you, that if this involves a discretionary duty, we never get to this case, we vacate and remand and dismiss for lack of jurisdiction? If it involves a discretionary duty, but under the Ninth Circuit authority, a discretionary duty does not involve a budgetary decision such as the evidence in this case. I don't think I asked that question. I think that the question I ask is, do you agree that if this involves a discretionary duty, that we should vacate and remand and instruct the district court to dismiss for lack of jurisdiction? That's what the Baird-Gertleman case says. You asked for an assignment to a different judge. Now, is there actual evidence of prejudice? You lost the case, but is there evidence that Judge Beislein is prejudiced? It's not so much that Judge Beislein is prejudiced, but Judge Beislein has adopted essentially the factual reasoning of the United States in dismissing the case. Judge Beislein dismissed this case, refused to reconsider it under Rule 59 motion because he believed it should be dismissed. Under the circumstances, he's shown that he's going to have a hard time putting that out of his mind, that evidence that he relied on in dismissing the case. Does that indicate that if we were to just overturn his decision, he wouldn't comply with whatever it is we said? Well, it wasn't illegal. It was a factual ruling. Basically, he's expressed his view of the merits of the case in the summary judgment order. Well, he had a view of the law, which may have been mistaken, but does that really mean? And is it a prejudicial view of the facts that he took? It is. He basically said that the government, the army should not be responsible in this kind of circumstance to provide a safe housing and parking lot for my client. Well, that seems to be a legal conclusion. The other factor that's considered in deciding whether the case should be reassigned, in my understanding, is whether there's going to be a concern about whether the judge is going to be able to, whether there's going to be an appearance that he can be just in the case. And I believe that in this case, there's an impression that's been created by Judge Weisslein specifically adopting the defendant's rationale and their opposition to the Rule 59 motion, that he's basically identified himself with the defendant in this case. And, you know, I mean, he's ignored the fact that, you know, under the Federal Tort Claims Act that the standard is whether a private person would be liable in the same circumstances. Thank you very much. Thank you. Good morning. May it please the Court. Anthony Yang from the Department of Justice on behalf of the United States. As our brief explained, the district court should have dismissed this case on the grounds that the discretionary function exception applies. And the court erred to the extent that he found a parenthetical in the snow removal policy to be a specific and unambiguous mandate to clear all snow prior to or by the end of March. As Judge Paez was noting, that policy is qualified in multiple respects. First of all, the parenthetical in it itself is ambiguous. It simply notes that the parking areas are cleared once per year in late February or March, which indicates the rough timeline that that's going to occur, but not a specific and mandatory deadline. That says will. No, actually, it doesn't. What does it say? It says there's five priorities set out. The first four are non-clean-up priorities. That is, they are plowed as snowfall accumulates through the year. The fifth priority is clean-up. And it says it's mainly bullet points. It says family housing parking areas is listed as the second area under clean-up per-ens, cleared once per year in late February or March, closed per-ens. It's pretty clear, right? Well, no, Your Honor. Actually, there are multiple things that make that. First of all, we don't believe that that's clear in and of itself, but there's multiple other aspects of the policy that make it clear that that's not a specific mandate to plow by April 1. First, the remaining part of that provision says that the lots are posted in advance and will be worked as priorities permit between snowstorms. Secondly, all the priorities are subject to change in emergency situations due to heavy snowfall. And finally, the policy goes on to state that, quote, areas in which vehicles have not been removed will be bypassed and moved to the bottom of the list due to the possibility of government damages and liability. The list itself is on Excerpts of Record 123, which lists out the – it's a little difficult to discern without reading the declaration that goes with it, but it is going to be plowed, and it goes all the way through April 1. And if that – that reflects not only that the Army was interpreting its reg to set a rough deadline, but also shows that if the – when the plows did arrive on March 9th and there were cars in the lot, moving this lot to the end of the list would have already put them in April, which suggests that, in fact, the policy is read as a whole, and it's not – in that it's not clear that it has to be a clear and definite mandate to plow by April 1. And, in fact, had that been the case, you would – it's odd to use a range of dates as an illustration that you would simply say cleared by April 1 or by the end of March. So taken in context, the snow removal policy does not, in fact, have a specific and definite mandate to require the removal of snow by a date certain, and that needs to be read also in context with the policy and, in fact, the contract that the tenants sign to take responsibility to conduct their own snow abatement throughout the winter, and including sanding any hazardous areas. Those responsibilities are delegated by both policy and then the federal contract to the actual residents of the base housing. And that's part and parcel with the whole policy of simply allowing plowing at the very end of the winter for purposes of cleanup. And that cleanup is provided simply not because it's slick – it's slick all winter – it's provided because during breakup – and this is at excerpts of top – the purpose of the clearing is to get rid of the hard pack before breakup renders the lot difficult to use. That is, the breakup of the ice renders the lot no longer relatively even, and it's difficult to navigate for vehicles. So the whole purpose of the cleanup is, at the end, is when the melting occurs to such an extent that there's large divots, the area's not navigable by car, that you clear it out so that it's usable. Let me – let me see if I understand your argument, or maybe you can help me understand your argument. So your argument is, is that when they created this policy, the creation of the policy was a result of their discretion? Or is it the implementation of the policy? Well, it's actually both, Your Honor. The implementation. It's both. The implementation as well as the design of the policy. The Supreme Court's made clear in Varieg Airlines is – Even taking your argument there that this is discretionary, is this the kind of discretion that they were intending that, you know, that Congress wanted to exempt? I mean, this seems awfully similar to that Summers case and a couple other cases. The Aero Leisure case. Right. Which is cited. I can't – I can't – you know, tell me why those cases shouldn't guide my assessment of her claim here on the jurisdictional. You see, what I – my assessment was – and I only speak for myself – but that there may well be jurisdiction here, but then you look at the government's duty sort of under this policy, which is a different question. You sort of measure the duty part of it under the – under these guidelines  Well, certainly, Your Honor – They may fail at that point, but we're talking – we're talking jurisdiction at the outset, and that's a little bit – I'm concerned that this – I don't really see much difference between what's going on here and what happened in Summers and the other – that other case. I'd like to address both of your concerns, Your Honor. First is the discretionary function aspect, and then kind of getting down to the nitty-gritty, the duty in light of the federal contract that imposes the responsibility for snow clearing on residents. We believe we went on both of those grounds, but I'll address the DF issue first. ARA Leisure and the Summers cases have been construed by this Court. In fact, a decision by Judge Wallace in Kennewick Irrigation makes clear that those cases, for instance, in ARA Leisure, involved a regulation that required the maintenance of a road in Denali National Park, that both the width and the firmness of that road be maintained. And in light of the – that regulation where the policy balancing had already been made, the Park Service couldn't simply say, well, we had budgetary issues. That policy balancing had already been done, and the National Union Fire Insurance case specifically addresses ARA Leisure and explains it in that context. The Summer case involved no evidence whatsoever that there was any – the decision not to place warning signs reflected any kind of competing policy consideration, and that's explained in Valdez. But both in Kennewick Irrigation and in National Union Fire Insurance, this Court explained that cost may be used, for instance, as a policy consideration which is balanced, depending on what the applicable regulations and policies context is in that case. So in this case, what we have is the military, which has a whole host of competing policy demands and limited manpower to resolve them, including the functions of the military base, including the decision, for instance, to provide base housing and if to provide base housing, on what terms, in light of the military's operational needs. And then within that also, where base housing is provided, it's been long been the policy of the Army dating back at least to the 1970s, if not before. And this is reflected in the policies around – starting at Excerpt of Record 69, that when base housing is provided, that base commanders must provide, to the maximum extent possible, for self-help remedies. This not only serves as an efficient allocation of base resources and allows the military to focus its manpower on its own operational needs, but also serves a social goal of promoting the sense of homeownership and community in base housing by essentially requiring that the housing occupants fend for themselves. Mr. Yang, could I go back to the policy? As I understand it, there's an exception for emergencies. Did the government show there was an emergency? No, Your Honor. So how did that exception apply? Well, what it does, Your Honor, is show that the – it does not apply in any of its terms, but it reflects that the policy, the parenthetical that we were discussing earlier itself, is not a specific and definite requirement. Well, I don't know. Many policies, which are very firm, have clear exceptions. And if the policy doesn't apply, then you have to show that the exception does. Well, certainly, Your Honor, I think you've picked the – You made no effort to do it. The government made no effort to do it. Well, with respect to the emergency aspect, but there are – for instance, the policy itself explains that these parking areas are cleared as priorities permit. Oh, yes, but that's – isn't that – that is just an organization. It's an organizational trap. But they're all to be cleared by March 31. No, Your Honor. In fact, the whole – the policy goes on for the final exception in the trifecta, which is to say when there are cars in the lot, when cars are in the parking area. Oh, that's right. That's true. Were there cars in the parking lot? There were on March 9th, and the Army tried to plow the lot on March 9th, but because the cars were there, it got moved to the end of the list. And as the list indicates, back on ER-122, that would have put it into April. When did she fall? April 1, morning of April 1. So with respect to this case, the – we don't believe there's any reasonable way to read that policy as providing, particularly in the context here, where the Army did, in fact, attempt to plow on March 9th. No way to read the policy is reasonably requiring the Army to plow before April 1. My time is expiring, Your Honor. You answered Judge Noonan's question. I believe I did, but Judge Noonan would be able to tell you. No, you did. Thank you, Mr. Noonan. You followed us from Anchorage to Fairbanks. Yes, Your Honor. It's been my pleasure to be with you both in the morning of Monday as well as the evening. Well, it was our pleasure to hear you. It was great to see you again. Thank you, Your Honor. Thank you. We would ask that you affirm the district court. All right. Matters. You can have a minute of rebuttal. Well, the provision talks about the priority for clearing family housings. Family housing is a different section than the part that talks about they can bypass lots where cars are left behind. We have an affidavit from our expert, Bob Tilly, who has been an engineer in Alaska for 40 years, who says if you don't clear the snow, in fact, his opinion was it's negligent not to clear the snow before the weather starts warming up in March because he says if you don't clear the snow, it's just going to melt away. What do you say to Mr. Yang's point that the Army tried on March 9th and they couldn't because of the vehicles. So it dropped to the bottom of the priority list. Well, there isn't any exception for the February and March time frame to have that snow removed in the snow removal policy. The provision that talks about putting a lot to the end of the list applies to all the lots at Fort Wainwright no matter when they were going to be plowed. The provision that we're talking about that says that the snow has to be removed by the end of March specifically discusses the family housing parking lots and there's no provision in the policy, the snow removal policy, that says that can be extended to any later time. Okay. Thank you. Thank you. The bullet for the United States is submitted. We'll go next to McCullough.
judges: Wallace, Noonan, Paez